1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      :    22-CR-317(LDH)

       Plaintiff ,          :
                              United States Courthouse
    -against-             :    Brooklyn, New York

JOSEPH ELIAS,                  :
                              April 5, 2024
       Defendant.          :    2:30 p.m.

- - - - - - - - - - - - X

REDACTED TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LASHANN DEARCY HALL
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          BREON PEACE
                        United States Attorney
                        BY: ERIC W. SILVERBERG,
                        Assistant United States Attorney
                        271 Cadman Plaza East
                        Brooklyn, New York 11201

For the Defendant:           BALLARD SPAHR LLP
                        1675 Broadway, Ste 19th Floor
                        New York, NY 10019
                        BY: MICHAEL P. ROBOTTI, ESQ.
                            NATHANIEL B. BOTWINICK, ESQ.

Court Reporter:              Andronikh M. Barna
                        225 Cadman Plaza East
                        Brooklyn, New York
                        (718) 613-2178

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

1          THE COURTROOM DEPUTY:  This is a criminal cause for

2    a sentencing in the matter of U.S.A. versus Joseph Elias,

3    Docket No. 22-CR-317.

4          Can Counsel please state their appearance for the

5    record, starting with the Government.

6          MR. SILVERBERG:  Good afternoon, Your Honor.

7          Eric Silverberg on behalf of the United States.

8          And joining me at counsel's table is U.S. Probation

9    Officer Ashtin Audain.

10          THE COURT:  Good afternoon.

11          MR. ROBOTTI:  Good afternoon, Your Honor.

12          Michael Robotti and Nathaniel Botwinick of Ballard

13    Spahr for Mr. Elias.

14          THE COURT:  Good afternoon to you all as well.

15          You may be seated.

16          All right, folks.  We are here today for a

17    sentencing determination on the information against the

18    Defendant, Mr. Joseph Elias.

19          Now, present today are counsel for the Government,

20    as well as the Defense.  Of course, the Defendant, Mr. Elias

21    is present, as well as a representative from the Probation

22    Department.

23          Now, on May 8th, 2023, Mr. Elias pleaded guilty to

24    Count One of the superseding information before

25    Magistrate Judge Levy, dated also May 8th, 2023.

3

1          Now, the sole count charges Mr. Elias with arson
2   conspiracy.  Specifically, that on or about March 22nd, 2022,
3   within the Eastern District of New York and elsewhere, the
4   Defendant, Joseph Elias, together with others, did knowingly
5   and intentionally conspire to use fire to commit a felony
6   which may be prosecuted in a court of the United States; to
7   wit, the use of extortionate means to collect one or more
8   extensions of credit from John Doe, an individual whose
9   identity is known to the United States Attorney, in violation
10  of Title 18, United States Code, Section 894, contrary to
11  Title 18, United States Code, Section 844(h)(1).
12          Now, this Court found that Mr. Elias made his plea
13  knowingly and voluntarily and that there was a factual basis
14  for Mr. Elias's plea.  Accordingly, on June 26, 2023, the
15  Court accepted Mr. Elias's plea of guilty to the sole count of
16  the superseding indictment.
17          Now, in advance of this proceeding, I received and I
18  reviewed a May 8th, 2023 superseding information which was
19  filed as ECF Docket No. 39, as well as a November 17, 2023
20  presentence investigation report and U.S. Probation sentencing
21  recommendation filed as ECF Dockets No. 47 and 47-1
22  respectively; a December 1st, 2023 letter objecting to the PSR
23  submitted by the Defendant and filed under seal as ECF Docket
24  No. 64; a December 8, 2023 addendum to the PSR filed under
25  seal as ECF Docket No. 48; a December 8th, 2003 sentencing

4

1   memorandum by the Government filed as ECF Docket No. 49; a

2   December 29, 2023 sentencing memorandum submitted by the

3   Defendant filed as ECF Docket No. 51; a February 23rd, 2024

4   sentencing memorandum supplement filed by the Defendant and

5   filed as ECF Docket No. 55; a March 25th, 2024 sentencing

6   memorandum supplement by the Defendant filed as ECF Docket No.

7   63; an April 3rd, 2004 supplemental sentencing submission

8   again by the Defendant filed as ECF Docket No. 65; an April 4,

9   2024 supplement to the sentencing submission by the Government

10  which was filed as ECF Docket No. 66; and finally, an

11  April 5th supplement to the sentencing submission by the

12  Defendant and filed as ECF Docket No. 67.

13           I almost loathe to ask this question, but are there

14  any other documents that the parties would like the Court to

15  have before it at this time?

16           MR. SILVERBERG:  The Government does not wish to

17  present to the Court any other documents.

18           THE COURT:  All right.

19           MR. ROBOTTI:  No, Your Honor.  I think you've

20  accurately recounted the many documents.

21           THE COURT:  Okay.  Thank you.

22           To the Government, do you have any witnesses present

23  here today?

24           MR. SILVERBERG:  I do not.

25           I will say for the record, we had notified the

5

1  victim pursuant to our victim notification obligations.  He's

2  aware of today's proceeding.  He is not present.

3        THE COURT:  Okay.

4        Am I correct that you do not believe I need to hold

5  any sort of evidentiary hearing to resolve any disputed issues

6  of fact?

7        MR. SILVERBERG:  That's correct.

8        THE COURT:  All right.

9        To the Defense, have you and your client had an

10  opportunity to read and discuss the presentence report?

11        MR. ROBOTTI:  Yes, Your Honor, we have.

12        THE COURT:  Okay.

13        And I understand that there may be some lingering

14  objections to the report notwithstanding the addendum by the

15  Probation Department; is that correct?

16        MR. ROBOTTI:  That's correct, Your Honor.

17        THE COURT:  All right.  I am going to get to those

18  in a moment.

19        Do you have any witnesses present here today?

20        MR. ROBOTTI:  No, Your Honor.

21        The Defendant's mother, Marisol Estrada, is present

22  here today to support her son, but we don't expect her to make

23  a statement.

24        THE COURT:  There is two people there.  Who else is

25  here?

6

1          MR. ROBOTTI:  And I believe that's also Mr. Elias's

2     niece.

3          THE COURT:  Good afternoon to you both.

4          All right.  Do you believe that I need to hold an

5     evidentiary hearing to resolve any disputed issues of fact?

6          MR. ROBOTTI:  No, Your Honor.  Particularly because

7     the MDC made several admissions last night regarding the

8     conditions at the jail, so we don't think need an evidentiary

9     hearing is necessary at this time.

10         THE COURT:  Okay.

11         Do you intend to have Mr. Elias's mom speak or is

12    she just present to be supportive?

13         MR. ROBOTTI:  She's just present to be supportive,

14    Your Honor.

15         THE COURT:  Okay.

16         All right.  I want to talk now about the maximum

17    sentence available for the sole count in the information.

18         Now, Count One, which is an arson conspiracy, the

19    maximum term of imprisonment is 20 years.  The Court may

20    impose a term of supervised release of not more than three

21    years.  And because Count One is a Class C felony, the

22    Defendant is eligible for not less than one, nor more than

23    five years of probation, and that is pursuant to 18 U.S.C.

24    Section 3561(c)(1).

25         Now, one of the following must be imposed as a

7

1 condition of probation, unless extraordinary circumstances

2 exist, and they are a fine, restitution, or community service.

3 Now, a maximum fine in this case is $250,000, and that is

4 pursuant to 18 U.S.C. Section 3571(b).  In addition, the Court

5 must impose a mandatory special assessment in the amount of

6 $100, and that is pursuant to 18 U.S.C. Section 3013.

7          Now, the PSR calculates an effective Guidelines

8 range in this case of 77 months to 96 months of imprisonment

9 and that is based on a total offense level of 21 and a

10 criminal history category of four.

11          Now, as I understand it, Mr. Elias has made an

12 objection to paragraph 3 of the PSR, specifically the

13 statement that Mr. Elias has absconded from supervision.

14          Your argument is that it is more accurate to state

15 that he failed to maintain regular contact with Pretrial

16 Services.  You also object that the statement does not include

17 that he attempted to receive substance abuse treatment at

18 Woodhull Hospital.  I do not see a basis to sustain this

19 objection with respect to the statement concerning that he had

20 absconded.

21          With respect to the attempt to receive substance

22 abuse treatment from Woodhull Hospital, was that addressed in

23 the addendum?

24          U.S.P.O. AUDAIN:  Yes, Your Honor.

25          THE COURT:  That has been resolved, correct?

8

1          U.S.P.O. AUDAIN:  Yes, Your Honor.



9



25    THE COURT:  Okay.  With respect to restitution,

10

1  which is set forth in paragraph 11 of the PSR, there was an

2  objection to the $378,600 restitution amount that was

3  proffered by the Government.  My question is whether the

4  information that has since been provided to the Defense with

5  respect to restitution has provided the Defendant with the

6  necessary information to determine whether an objection to the

7  restitution has a basis.

8         MR. ROBOTTI:  Yes, Your Honor, the Defendant still

9  objects.  We don't believe that the information that has been

10  provided by the Government to date supports the amount that's

11  stated in the PSR.  In fact, we think the information provided

12  by the Government shows that the amounts of the cars were, in

13  fact, inflated and overstated by the victim.

14         THE COURT:  To the insurance company?

15         MR. ROBOTTI:  To the Government.

16         THE COURT:  Or just to the Government?

17         MR. ROBOTTI:  Yes, to the Government.

18         I'm not aware and I don't think we have what was

19  submitted to the insurance company.

20         THE COURT:  We saw the transmittal of the documents,

21  but I do not think I have seen them.

22         Can you hand them up.

23         MR. SILVERBERG:  Your Honor, I don't have them with

24  me.  I'm happy to provide them to the Court afterwards.

25         On restitution, the parties were going to propose

1   that the Court schedule a restitution hearing for --

2          THE COURT:  Well, I mean, I can schedule a

3   restitution hearing, and certainly if it cannot be resolved,

4   but it would have been helpful for me to have the documents

5   that you provided to the Defendant because maybe I would have

6   agreed with you and thought that there was sufficient basis.

7   But if I do not have them, I cannot look at them.

8          MR. SILVERBERG:  I understand, Your Honor.  I

9   apologize for not having them with me.

10          We understood that based upon the Defendant's

11   request to put over restitution for 90 days in the sentencing

12   memorandum, I was not prepared to address restitution.

13          THE COURT:  If only a request made it so.

14          I may not have agreed with the Defendant, right?

15          MR. SILVERBERG:  Right.

16          THE COURT:  But now I am in a position where I need

17   to have the hearing.  It's done.  I will have to find a date

18   in what is a very busy calendar of mine.  And so, it is what

19   it is, you are not prepared to give me the information today.

20   Catherine will give you all a date.

21          Catherine, where are we at in terms of dates?

22          THE COURTROOM DEPUTY:  How far out would you like,

23   Judge?

24          THE COURT:  The truth of the matter is, it is really

25   up to you for when you think -- because you have all the

1    information you need now, right?  So this is not a

2    fact-gathering mission for you, this is just an opportunity to

3    be heard by the Court?

4              MR. SILVERBERG:  Yes.

5              That said, it's possible the victim will give us

6    more information.  He has conveyed to us he's just going to

7    continue to look.

8              Our position is, we have enough information.

9              THE COURT:  What was it that you provided?

10             Was it just an affidavit by the victim?

11             MR. SILVERBERG:  No, Your Honor.

12             We provided tax documentation reflecting income.

13             Actually, let me back up.

14             The restitution consists of three components.  The

15   first is lost income.  The second is property damage.  The

16   third is money related to -- like stolen money, effectively.

17             As to the property damage --

18             THE COURT:  Wait, wait.

19             Money that was on the premises in that before the

20   Molotov cocktail was lobbed into the building was stolen?

21             MR. SILVERBERG:  No, Your Honor.

22             After the arson, the Defendant called the victim

23   anonymously, or purporting to be anonymous, and claimed he had

24   information --

25             THE COURT:  Right.

1           MR. SILVERBERG:  -- about who committed and said

2    "you need to pay me."

3           THE COURT:  Okay.

4           MR. SILVERBERG:  So the Defendant paid him money.

5           THE COURT:  Okay.  That is what you are calling the

6    stolen money.

7           MR. SILVERBERG:  Yes.

8           THE COURT:  The extorted money is what I --

9           MR. SILVERBERG:  Yes, under false pretenses.

10          THE COURT:  Yes.

11          MR. SILVERBERG:  So the documents we've provided to

12   the Defense consist of bills of sale associated with these

13   eight BMWs that were in the yard that were burned.  That is --

14   there is also other -- you know, that's the destruction of

15   property components.

16          There's tax return documentation going back the last

17   decade.  The Defendant calculated his lost income figure based

18   upon one-year's worth of lost income.  And so he averaged his

19   income over the prior years and is offering 88,500 as lost

20   income.  And so he's provided tax --

21          THE COURT:  For the one year?

22          MR. SILVERBERG:  Yes, exactly.

23          So he's provided tax documentation reflecting his

24   income for prior years in support of that.

25          And I don't believe the stolen money is disputed.

14

1          THE COURT:  Well, at least from the nature of your
2   objection as it was articulated here, it seems to be about the
3   value of the vehicles?  The issue seems narrowed to the
4   vehicles.  Am I right?
5          MR. ROBOTTI:  So I don't think we dispute the amount
6   of money that he's speaking about that was paid by the
7   victim --
8          THE COURT:  And the income?
9          MR. ROBOTTI:  The income I think we are going to
10  dispute.  I think that what's in the affidavit of loss versus
11  what's in the documents are two different things.  I think the
12  documents support a lesser amount.
13         THE COURT:  Have you all done your own calculation?
14         Well, first let me ask this question.  Is the
15  methodology that the Government used in terms of averaging,
16  you said ten -- is it ten years?
17         MR. SILVERBERG:  He took, the victim -- to be clear,
18  this was the victim's methodology.  He took his lost income
19  from I believe 14 years.
20         THE COURT:  So 14 years?
21         MR. SILVERBERG:  That's the existence of his
22  business.
23         THE COURT:  So he took his income from 14 years and
24  did an average of what he believes he was making per year?
25         MR. SILVERBERG:  Exactly.

1        THE COURT:  Is the problem with the method or is the

2  problem with calculation?

3        MR. ROBOTTI:  I don't know that we're going to agree

4  to the method, Your Honor.  I think we still need to take a

5  look at that.

6        THE COURT:  How is it that you think is a better

7  approach in terms of methodology?

8        MR. ROBOTTI:  My understanding is that he should be

9  only valuing his lost income for part of the year.  The arson

10  occurred in March.  It wasn't for the full year.  So I don't

11  think Mr. Elias should be paying for the income he had from

12  January through March of that year.

13        So I think that's one issue.

14        THE COURT:  So you are saying there is three months

15  of the year, so it should be, if it is 88,000, we are talking

16  about three-quarters of 88,000, right?  Thereabouts, right?

17        MR. SILVERBERG:  Correct.

18        THE COURT:  I don't do math.  Somebody has a number

19  for that.

20        So assuming -- there is rhyme and reason to that

21  objection.

22        MR. SILVERBERG:  I understand.

23        I will say in response; so, this crime devastated

24  the victim's business.  He has not reopened.  He had to

25  shutter his business.  And so I actually think --

16

1          THE COURT:  What is date of the crime?

2          MR. SILVERBERG:  March 22nd, 2022, I believe.

3          I said "I believe" because I need to look at the

4   exact date.  It was March twenty-something, 2022.

5          THE COURT:  But regardless, it has been two years

6   and the business has not yet opened and he is only seeking one

7   year.

8          MR. SILVERBERG:  Exactly.

9          And he won't open.  He left the country.  He moved.

10  He was an immigrant from Poland.  He picked up and left.

11          THE COURT:  Alright, well.

12          MR. ROBOTTI:  And I would say we're also not aware

13  of whether he made additional income.  I assume his income

14  hasn't been zero since that time, so I think there may be an

15  offset in terms of what the lost income here is.

16          THE COURT:  Right.  But hold on.

17          There is a reason why, at least in his own mind, he

18  truncated it to one year and at a certain point he gave up the

19  business and he moved to another country.  It is not going to

20  be a lost income forever.  And so it seems as if the one year

21  was what seemed reasonable, which I am just going to tell you

22  that my inclination is to say that should be nine months.

23          MR. SILVERBERG:  Fair enough.

24          I mention that to say from our perspective the

25  victim's request was reasonable, not seeking to take advantage

1    of this.  I thought a year was a reasonable estimation even if

2    it went to March 2023.

3            I hear Your Honor, but I don't believe that just

4    because this crime happened in March, he's not entitled to

5    one-year's worth of lost income.

6            THE COURT:  What is the situation with the BMWs?

7            MR. SILVERBERG:  So the Defendant was -- excuse me,

8    the victim, it was an auto body shop and he -- this crime

9    happened in the winter.  And he, it was his practice to

10   supplement his income in the winter months, which --

11           THE COURT:  No, no.  What I mean is, in terms of the

12   amount of money, Defense Counsel is saying he thinks that the

13   number that was assigned to each of the eight individuals was

14   inflated somehow.

15           I am just curious, wouldn't the insurance paperwork

16   provide us with kind of a sense of the value of these vehicles

17   that is not speculative?

18           MR. SILVERBERG:  So my understanding, there's no

19   insurance.  That's part of the problem with it.

20           THE COURT:  He had a business that had eight BMWs

21   and no insurance?

22           MR. SILVERBERG:  There was no insurance, to my

23   understanding.  And that's part of the crime -- I think that's

24   part of its -- yes, there was no insurance.

25           What he was doing was, he was purchasing BMWs and

1   refurbishing and reselling them.  So his analysis for these

2   eight BMWs consists of both the cost, the estimated resale

3   value, and the work and the labor that he put into --

4            THE COURT:  Were they already refurbished?

5            MR. SILVERBERG:  I don't know if they were all

6   refurbished at that time.

7            THE COURT:  If they were not refurbished, he is not

8   going to get the benefit of the refurbished value of the car.

9   If they had not been yet refurbished.

10            This is what I am going to urge you all.  I am going

11   to set this down for a restitution hearing.  This seems to me

12   like an issue that you all should be able to meet and confer

13   on and come to an agreement on.  The disagreement here, it

14   just does not seem like it is so great that it requires court

15   intervention, so I am going to ask for you all to confer.

16            I am going to set this down for a restitution

17   hearing at the beginning of June, but with the expectation

18   that I am not going to have to have it because you all are

19   going to be reasonable in your approach, you are going to come

20   up with a number that makes sense and that you will find some

21   middle ground.

22            We are not going to go more than a year.  Perhaps it

23   is not nine months.  Maybe it is ten months, maybe it is

24   eleven months.  But you guys are not far apart enough that I

25   should have to spend really any time entertaining arguments on

1  this.  It just doesn't seem that to me.

2          He is not going to get the benefit of the value of

3  work he never did.  And you all should consider, we are going

4  to talk about acquisition costs, but also there is going to be

5  potentially some opportunity costs that he lost because he was

6  not able to then sell them.

7          Come up with a reasonable approach.  All right?

8  Fair enough?

9          MR. SILVERBERG:  Understood, Your Honor.

10          MR. ROBOTTI:  Yes, Your Honor.

11          THE COURT:  The placeholder date for any restitution

12  hearing is going to be June 12th at 2:30 p.m.

13          All right.  Does that resolve any objection that was

14  not otherwise addressed through the addendum?  I think it

15  does.

16          MR. ROBOTTI:  Yes, Your Honor.

17          THE COURT:  All right.

18          The Court adopts the PSR as modified ███████████████

19  ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ███████████████████████████

22          At this time I am going to calculate the Guidelines

23  range to Mr. Elias's offense.

24          As to Count One, conspiracy to use fire or/and

25  explosives to commit a felony.  The guideline for an 18 U.S.C.

1  Section 844(m) offense is Sentencing Guidelines Section 2K1.3.

2  Now, given that Mr. Elias used or possessed explosive material

3  in connection with the commission or attempted commission of

4  another offense, Sentencing Guidelines Section 2X1.1 is

5  applied because the resulting offense level is greater than

6  that determined at Sentencing Guidelines Section 2K1.3(3).

7  That is pursuant to the cross reference at 2K1.3(c)(1)(B).

8         Now, in the plea agreement, Mr. Elias stipulated

9  that on March 22nd, 2022 he damaged and destroyed, by means of

10  fire, certain property located at Magnum Automotive Body Shop

11  for the purpose of collecting or attempting to collect any

12  extension of credit or to punish a person for the

13  non-repayment thereof.  Thus, Sentencing Guidelines Section

14  2E2.1 is the guideline for the substantive offense.  That

15  section provides for a base offense level of 21.

16         Now, a dangerous weapon, specifically a cocktail

17  constituting an explosive material, was otherwise used,

18  therefore, four levels are added.  And that is pursuant to

19  Sentencing Guidelines 2E2.1(b)(1)(B), bringing the total

20  offense level to 24.

21         Two levels are subtracted, however, as Mr. Elias has

22  accepted responsibility.  And that is pursuant to Sentencing

23  Guidelines Section 3E1.1(a), which brings the offense level

24  down to 22.

25         In addition, I understand the Government intends to

1  make a motion stating that it was notified in a timely manner

2  of Mr. Elias's intention to enter a guilty plea and requesting

3  a one-point reduction as a result.

4          Does the Government so move?

5          MR. SILVERBERG:  Yes, Your Honor.

6          THE COURT:  The Government's motion is granted.  An

7  additional one point is deducted.  Accordingly, the total

8  offense level here rests at 21.

9          Of course, the Court must take into account

10  Mr. Elias's criminal history in calculating any Guidelines

11  range.  Now, as to Mr. Elias's criminal history, the Court

12  calculates a total criminal history score of seventeen.

13          Now, according to the Sentencing Table in Chapter 5,

14  Part A of the Sentencing Guidelines, a criminal history score

15  of seventeen establishes a criminal history category of six.

16  With a total offense level of 21 and a criminal history

17  category of six, the Court calculates a corresponding advisory

18  Guidelines range at 77 to 96 months.

19          The Guidelines range for a term of supervised

20  release is one to three years.

21          Mr. Elias is ineligible for probation because the

22  applicable Guidelines range falls within Zone D of the

23  Sentencing Table.

24          The Guidelines fine range applicable in this case is

25  15,000 to $150,000.  And that is pursuant to Sentencing

1   Guidelines Section 5E1.2(c)(3).

2           If the Defendant is convicted under a statute

3   authorizing a) a maximum fine greater than $500,000 or b) a

4   fine for each day of violation, the Court may impose a fine of

5   up to the maximum authorized by statute.

6           Now, restitution is mandatory pursuant to 18 U.S.C.

7   Section 3663(a) and Guidelines Section 5E1.1(a)(1).

8   Consistent with the Court's direction, the parties are going

9   to meet and confer with the hope of coming to an agreement on

10  a restitution amount.  If the parties are unable to do so, we

11  will hold a restitution hearing on June 12th at 2:30 p.m.

12          Are there any objections to the Court's calculation

13  of the Guidelines range?

14          MR. SILVERBERG:  Not from the Government.

15          MR. ROBOTTI:  No, Your Honor.

16          THE COURT:  All right.

17          Okay.  At this time I want to hear from the parties

18  regarding any departures from the Guidelines range.  I don't

19  want to hear any variances just yet, only departures.

20          Can I hear from the Government.

21          MR. SILVERBERG:  We don't believe there is a basis

22  for a departure.

23          THE COURT:  Okay.

24          MR. ROBOTTI:  We are not seeking a departure under

25  the Guidelines.  We are seeking a variance.

1          THE COURT:  All right.

2          Having calculated the Guidelines and considering the

3    propriety of departure, I think that there is an agreement

4    there is no basis for a departure here.

5          I must now consider the relevant factors set out by

6    Congress in 18 U.S.C. Section 3553(a) to ensure that I impose

7    a sentence that is sufficient but not greater than necessary

8    to comply with the purposes of sentencing.

9          Now, these purposes include the need for the

10   sentence to reflect the seriousness of the crime, promote

11   respect for the law, and provide just punishment for the

12   offense.  The sentence should also deter criminal conduct,

13   protect the public from future crime by the Defendant, and

14   promote rehabilitation.  In addition to the Guidelines and the

15   policy statements, I must consider the nature and the

16   circumstances of the offense, the history and characteristics

17   of the Defendant, the need to avoid unwarranted sentence

18   disparities among similarly situated defendants, the types of

19   sentences available, and the need to provide restitution to

20   any victims of the offense.

21         All right.  I understand that the Government is

22   arguing -- perhaps as agreed to, but nonetheless is arguing

23   just for a Guidelines sentence.  And so I am assuming you are

24   not going to argue for any variances as well, right?

25         MR. SILVERBERG:  No.

24

1          Although I do want to clarify our position, which is

2   we -- and I'm happy to speak to it now.

3          THE COURT:  Yes.

4          MR. SILVERBERG:  Or when Your Honor wants.

5          THE COURT:  No, now would be good.

6          MR. SILVERBERG:  Okay.  Sure, Your Honor.

7          We're seeking a sentence at the bottom of the

8   Guidelines range, which I believe is consistent with the

9   sentence that Probation is seeking as well.

10          THE COURT:  Yes.  Probation recommends, I think it

11  is 77 months as well.

12          U.S.P.O. AUDAIN:  Yes, Your Honor.

13          THE COURT:  Okay.

14          MR. SILVERBERG:  I will be very brief.  I know

15  Your Honor has read over the paperwork and there's a lot of

16  it.

17          THE COURT:  Yes.

18          MR. SILVERBERG:  Obviously, it is a serious, very

19  serious crime.  I don't think anyone disputes that.  You know,

20  arson is a serious crime and that it was done to collect

21  extortionate credit is very serious.  I've talked about the

22  devastation that this brought on the victim, who, as I said,

23  lost his business and left the country and has suffered

24  financial loss.

25          We think deterrence is very important in this case

1   and I think that the basis for general deterrence in a case

2   like this are obvious.

3        I do think there is also a specific need for

4   specific deterrence in this case.  The Defendant has a very

5   substantial criminal history, including offenses that involved

6   violence and instrumentalities of violence.  We don't believe

7   time served is an adequate sentence and we do think the

8   Defendant poses a risk to the community.

9        And this isn't a theoretical concern, from the

10  Government's perspective.  When the Defendant was first

11  arrested in this case, Defense Counsel came to us at the time

12  of arraignment and asked us to consider an inpatient facility

13  so the Defendant could get treatment.  And very reluctantly,

14  we agreed.  And we agreed because we wanted the Defendant to

15  get treatment.

16       THE COURT:  Mental health treatment or substance

17  abuse treatment?

18       MR. SILVERBERG:  Substance abuse treatment.

19       And what happened was incredibly distressing, from

20  our perspective.  We believe he absconded from his inpatient

21  facility.  He did abscond.  It was really, I don't think

22  there's any -- I don't think that can --

23       THE COURT:  Well, my determination on the objection

24  I think answers the question, at least from the Court's

25  perspective.

26

1        MR. SILVERBERG:  Yes.

2        And then the Defendant went out and committed two

3   more crimes.  And so we worry about that situation again now.

4        I don't want to spend too much time on the cases

5   cited by the Defendant with respect to what -- their position

6   is that those were potentially similarly situated or analogous

7   cases and they've asked Your Honor to avoid unwarranted

8   sentencing disparities.  In our estimation, those cases were

9   outliers, both factually and in terms of the sentences that

10  were imposed.  There have been a number of cases in this

11  district where courts have imposed sentences that are more in

12  line with the Government's recommendation.  And I think

13  regardless, as with any sentencing, Your Honor will make a

14  determination based upon the facts and circumstances of this

15  case.  And so of course we don't dispute that avoiding

16  unwarranted sentencing disparities is an important

17  consideration for the Court; I don't believe that a sentence

18  at the bottom of the Guidelines range would work that effect.

19        THE COURT:  I have a question for the Government in

20  terms of when you said you wanted to clarify your position

21  with respect to advocating, at sentence, the Guidelines range.

22        And the Probation Department's recommendation came

23  in November of 2023?  Is that right for the date of the PSR?

24  Something around there, November of 2023?

25        U.S.P.O. AUDAIN:  That's correct, Your Honor.

27

1          THE COURT:  Which was a below Guidelines range.

2          Without the benefit of some of the more recent

3    information that the Court has received concerning the

4    conditions of confinement of Mr. Elias -- and certainly the

5    Court could turn the question to the Probation Department, but

6    I am going to ask the question of the Government -- if in

7    November, before the recent events occurred, a 77-month

8    sentence was appropriate, should the Court not consider or the

9    Government not consider revising its own recommendation in

10   light of the information that was received, assuming that the

11   Government's recommendation was formed prior to learning of

12   the recent events as well?

13         MR. SILVERBERG:  Yes, Your Honor.

14         So what I am saying is a clarified recommendation

15   today, maybe it's better phrased as revised recommendation.

16         THE COURT:  That's your revised.

17         MR. SILVERBERG:  Or a more particular

18   recommendation.

19         This information is certainly relevant.  I believe

20   that the conditions of confinement are a relevant

21   consideration under 3553(a).

22         And, you know, we've responded last night about the

23   information we've been able to get.  The MDC has disputed

24   certain aspects of the Defendant's letter, they concede other

25   aspects.  We're relaying the information.  Frankly, I think

1    Your Honor knows we do our best to get information, pass it to

2    the Court.  I'm not taking positions on the particular factual

3    disputes, but I think the headline is there have been issues

4    with conditions of confinement.

5         Some of them cut the other way, meaning the

6    Defendant has a number of disciplinary infractions.  We view

7    that as a problem and that's part --

8         THE COURT:  No.  We are absolutely not going to have

9    a conversation about the conditions of confinement at the same

10   time we have a discussion about his conduct.  The way in which

11   the Government conducts itself, the way in which we treat

12   defendants is not dependent upon the way in which they behave.

13   The conversation should not be had at the same time, not even

14   close so that I can think that you were suggesting that there

15   is a setoff here.

16        MR. SILVERBERG:  I'm not.  I want to be clear.  I am

17   not suggesting that.  I apologize for suggesting that.  I am

18   just saying that we are doing our due diligence.  We're still

19   gathering information.  And, frankly, I have more information

20   I'm happy to give to the Court in light of the letter that was

21   filed very late last night, which I'm happy to give now or

22   afterwards.  I'm not suggesting that the two are the same

23   thing.  All I'm saying is that we got more information.  I

24   passed it along, what I understand to be the case.

25        But to answer Your Honor's original question, this

29

1  information is relevant and it informs our revised sentencing

2  recommendation.

3          THE COURT:  All right.  Anything else?

4          MR. SILVERBERG:  Nothing else, Your Honor, unless

5  you have any other questions.

6          THE COURT:  No, I don't.

7          Okay.  I will hear from the Defense.

8          MR. ROBOTTI:  Thank you, Judge.

9          So I just want to take a few minutes to emphasize

10  some points in our submissions.  I appreciate the Court's

11  indulgence of the many submissions we've had.  And I

12  understand you've read them all, so I really appreciate that

13  and I don't want to belabor these points, but I think there

14  are some points that bear emphasis here.

15          So I think we need to begin, as you will hear from

16  Joseph in a couple of minutes, that he accepts full

17  responsibility for his conduct here.  He even said this during

18  his plea proceeding.  He understands the seriousness of the

19  conduct.  He's very sorry it occurred.  If he could go back in

20  time and do it over again, he wouldn't have done this.  And so

21  I think it's important to start with that understanding.

22          But I also think it's important that while Joseph

23  accepts full responsibility, we also can't ignore what led him

24  here.  Joseph has a disease, a serious one.  He has been a

25  drug addict for his entire life.  He started using drugs at

1   the age of twelve with marijuana, and then by his twenties he

2   was using crack and cocaine on a nearly daily basis.  And you

3   could fast-forward to the pandemic, you know, 2020, he is in

4   his early thirties, it hits him very hard; he hits rock bottom

5   and he turns to heroin.  And heroin, which was laced with

6   fentanyl and Xanax, led him to unintentionally use those drugs

7   as well.

8          And so his addiction at the time of this offense in

9   2022 was truly his darkest time.  And it doesn't justify it,

10  but it does explain how we got here.  And I do think that is

11  an appropriate consideration under 3553(a).  This was not

12  someone who, with a clear mind and clear intent, set out that

13  night to go burn down this shop.  This was someone who was in

14  the throes of a very serious addiction.

15         THE COURT:  Well, he could have both been in the

16  throes of a very serious addiction and have intended, as he

17  pleaded guilty to doing, to throwing a Molotov cocktail into

18  this building.  I mean, don't go too far.

19         MR. SILVERBERG:  I understand, Your Honor.  And I

20  think "intent" was probably the wrong choice of words there.

21  I'm not suggesting he did not have the legal intent or the

22  requisite intent to commit this crime.

23         All I am saying is he was not someone who was sober

24  and made this decision.  He was somebody who was under a

25  severe drug addiction at the time.  And he was doing it

1  because he was desperate for money, because his drug addiction

2  had eaten up all of his money and he was trying to get his son

3  a birthday present at this time.  So that's what drove this

4  offense.

5        And I will say that, you know, having gotten to know

6  Joseph over the last couple of years, he's a good man.  He's a

7  loving and caring father, and he made a mistake.

8        And, you know, as you heard from his mother in the

9  letter that she wrote in support of him, he became an

10  unrecognizable person during this drug addiction.

11        And he doesn't want to go back to that person.  He

12  wants to change his life and he wants to break free of this

13  addiction.  He is ready to change, Your Honor.  He has three

14  kids right now:  Janiyah, who is sixteen; Xadien, who is

15  twelve; and Leonidas who is eight.  And I will say that they

16  are what is motivating him to change his life.  He is

17  committed to changing for them because he wants to be a part

18  of their life.

19        And he also has a strong support network that I

20  think demonstrates that when he gets out he's going to be able

21  to help turn around this addiction and help stay in treatment.

22  You know, the --

23        THE COURT:  Forgive me.

24        MR. ROBOTTI:  Sure.

25        THE COURT:  And you will correct me where I am

32

1    wrong.

2            But in terms of any recent sobriety, it's been since

3    he has been in custody.  As the Court has found, he absconded

4    from treatment.  And so what I am struggling with here is the

5    notion that with respect to this particular defendant and

6    given the facts that I know about this particular defendant,

7    and given the opportunities he had under the supervision of

8    Pretrial to receive inpatient treatment, the successes

9    occurred while he has been in custody.

10           And there are facilities in the federal system that

11   have drug treatment programs, so in terms of addressing the

12   addiction, the disease that you have raised, is it not the

13   case that this Court could just as readily determine that

14   treatment in custody at a facility that has such programs

15   would be best suited to address that problem?

16           He did not do well on his own outside of custody,

17   notwithstanding efforts to get him treatment.

18           MR. ROBOTTI:  I understand that concern, but I think

19   Joseph today is different than Joseph twenty months ago.  All

20   right?  Twenty months ago was when he had just been arrested,

21   he was still addicted to heroin.  And he got out and they

22   tried to send him to inpatient treatment and he failed at it;

23   he did.  But we are twenty months later where he hasn't used

24   heroin, he's off heroin, he's been on treatment.

25           THE COURT:  Right, but he has done the imprisonment

33

1     and then come out.  And then, if I am -- because I am not the
2     oracle, which I say often.  So, I am not the oracle.  I do not
3     have a crystal ball, but what I do have is history.  And it
4     does not seem to me that what you are suggesting here will
5     necessarily play out, given what I can see in the PSR and in
6     terms of his history.

7          I will agree with you that it does seem as if -- he
8     has a particularly high criminal history category, I think we
9     can all agree.  But I also agree with you that the nature of
10    those crimes, which I think is different than the nature of
11    the crime that he has pleaded guilty to here, but the nature
12    of those other crimes, I can see a direct tie to his drug
13    addiction.  We have stealing from store shelves, et cetera.

14         And so, in effect, I could view this and liken this
15    case where you have an overstated criminal history category,
16    whereas not a case where I have someone who has committed
17    violent crimes, et cetera, but these kind of more drug
18    addiction related crimes.  I will agree with you on that.

19         But in terms of the notion that custody here would
20    be antithetical to treatment, I just cannot get that far.

21         MR. ROBOTTI:  Well, I think a couple of points,
22    Your Honor.

23         I do think there is a history when he was younger.
24    He got out of state custody back in I think 2011 and he did
25    successfully complete a drug treatment program following his

1  custody at that time.  So I do think there is a history of him

2  getting treatment and sticking with it.

3       I think the example back in July of last year, it

4  was a failed experiment, I agree with that.  But it was a

5  different time than it is now.  He has been on methadone.  He

6  has been on Suboxone.  And I think, frankly, at this point the

7  Bureau of Prisons has taken him as far as they can go in terms

8  of treatment.

9       You know, in terms of his condition, as we've talked

10  about --

11       THE COURT:  But what is the basis for that

12  statement?

13       He has been at the MDC.  There are facilities that

14  have really robust drug treatment programs, the MDC does not.

15  So the notion that the Bureau of Prisons has taken him as far

16  as he can go and he has been housed at the MDC and has not

17  been housed at a facility with such robust programs I think

18  makes that conclusion, at best, premature.

19       MR. ROBOTTI:  Well, I think, Your Honor, that his

20  best chance of success is going to be in the community with

21  support from his family under tight supervision.  Tight

22  supervision.  Whatever supervision conditions the Court thinks

23  is appropriate.  But he needs a support network.

24       THE COURT:  Yes, he does.

25       MR. ROBOTTI:  He needs help.  And he has it out

1    there.

2              And by seeing his kids on a regular basis and

3    working for them, I think he has the best chance of success.

4              His time at the MDC has drastically exasperated

5    these problems.  I mean, the mental state that he has been in,

6    as we have submitted to the Court under seal, has been dire.

7    And that is a direct result of the conditions there.  So his

8    success over the last twenty months in terms of making

9    progress on his drug treatment, that is directly in spite of,

10   not because of, the treatment that he got at the Bureau of

11   Prisons.

12             THE COURT:  Look, I am not going to defend the MDC

13   to anyone.  The conditions at the MDC, as far as I am

14   concerned, are deplorable and the Court intends to take that

15   into consideration in fashioning the appropriate sentence

16   here.

17             I also intend to take into consideration those

18   aspects of his criminal history category that I believe are

19   driven by his drug addiction.  However, some of the criminal

20   history, I do not feel the same way about.  And I do not feel

21   the same way about the crime that is charged here in terms of

22   how I view it.

23             You have asked for a time-served sentence.  I just

24   cannot get to time served.  He has been in, is it

25   eighteen months?  Approximately eighteen months at this point?

36

1          MR. ROBOTTI:  Twenty months.

2          THE COURT:  Forgive me, twenty months.

3          We have a Guidelines range here that is at 77 to

4    96 months.  And while that may be more than what is

5    appropriate, more than what is sufficient, I cannot get you to

6    time served.  I am going to be honest with you.  He is not

7    going to go home today.

8          MR. ROBOTTI:  I understand, Your Honor.

9          I think what we're asking for here is, give him a

10   chance.

11         I mean, he has had a dire experience at the MDC over

12   twenty months, which has been very severe punishment, and I

13   think our submissions plus the MDC's admissions adequately

14   demonstrate that.

15         He will be on a tight leash on supervised release.

16   Okay?  He has made a lot of progress since he absconded from

17   supervision back in July of 2020, a lot of progress.  He's

18   worked very hard at that.  Your Honor, you can let him out on

19   supervised release and if he screws up, he'll go back to jail

20   and he'll do drug treatment in jail at that point.

21         But I will urge you to give him a chance.  I think

22   that he will be successful if he gets out into the community

23   and he is seeing his kids and he is working towards changing

24   himself.

25         THE COURT:  He will ultimately get out.  But again,

1   he is not going home today.

2           MR. ROBOTTI:  I understand.  I hear you.

3           THE COURT:  Just so we are all clear, that is not

4   happening.

5           But, you know, ultimately -- and I have said this to

6   other defendants -- if the evolution is genuine and if he has

7   decided that this is what he wants to do, that decision will

8   remain, notwithstanding the sentence I impose.  If it is

9   genuine, it cannot be conditioned upon the amount of time that

10  I sentence him to.  It just can't be.

11          MR. ROBOTTI:  I understand that.

12          And look, getting him out of the MDC as soon as

13  possible is going to help.  Because what is going on there is

14  cruel and unjust.  I just think it's, frankly, a tragedy for

15  the justice system.

16          THE COURT:  I am not going to disagree with you.

17          And I will say that the Bureau of Prisons, the

18  executive branch has put the judicial branch in an unenviable

19  position in terms of how to fashion an appropriate sentence.

20          I apologize to you, sir, that you had to endure

21  conditions that are unfit for any person, period.  And I will

22  take that into account, I assure you.  And again, my apology

23  is sincere.

24          District court judges in this district, as well as

25  in the Southern District, have made an issue of this.  We have

38

1   adjusted pretty consistently every sentence that we have

2   fashioned to try and address the conditions at the MDC.  Judge

3   Furman recently wrote a lengthy opinion cited by everyone, and

4   so it is not lost on us.  And it just makes our job that much

5   more difficult.

6          But beyond making our job that much difficult, the

7   problem is, as Counsel has identified, is that these are

8   individuals who are having to exist intolerable and

9   inexcusable conditions in the United States of America.

10          So I am going to take it all into consideration, I

11   assure you.

12          MR. ROBOTTI:  And we appreciate that, Your Honor.

13          I think I would say, look, I understand Your Honor's

14   position that he's not going home today.  Okay.

15          If we're starting from that point, then I think he

16   should go to the best possible treatment center that we can

17   get him in, in the Bureau of Prisons, but I would urge the

18   Court to keep it short.  I think he's he going to have a lot

19   of success there.  I think he has demonstrated to us over the

20   last twenty months, despite these conditions, that he is

21   committed to getting off of drugs and I think he will be

22   successful in whatever next program he goes to.

23          And then give him a chance on supervised release,

24   Judge.  You can always send him back to jail if he screws up,

25   but I don't think he's going to.  I think he's ready to get

1  out, turn the page on this past part of his life, and start

2  being a productive member of society again and helping be

3  there with his kids and his family and supporting them.  He

4  wants that.  He wants to be a role model for them.  He wants

5  to be in their lives and I think he's going to do that.  And I

6  don't think the Court will be disappointed in him if it gives

7  him that chance.

8          So we're asking Your Honor for a chance here today.

9  Let Joseph go out there and show you that he's ready to turn

10  his life around.

11          THE COURT:  I would be remiss if I did not note that

12  I agree with the Government with respect to its assessment of

13  the two cases that you have cited in terms of the arson cases.

14  I do not believe that he is similarly situated to those

15  defendants.  And I am particularly thinking of the *Mattis* case

16  which was before Judge Cogan.  The facts in that case were

17  particularly unique.  He does not sit similarly situated to

18  those defendants.

19          And so in assessing similarly, the determination of

20  whether someone is similarly situated, you can imagine that

21  the Court is not just looking to the crime but looking to the

22  entirety of the information that the Court may have on an

23  individual.  And I am certain you are aware of the defendants

24  at least in the *Mattis* case, neither one of them had any

25  criminal history whatsoever and there were other unique facts

40

1   about those defendants.  One was a practicing attorney who had

2   just or had been at the time fostering a nine-year-old

3   daughter in his home that he still resided in, in I believe it

4   was the Bed-Stuy neighborhood.  There is a lot about those

5   individuals that is different than Mr. Elias.

6           And so I just need to be clear.  While I appreciate

7   those cases, I understand what motivated, at least from my

8   perspective, the sentences that were meted out in those cases,

9   and the facts upon which those sentences were based are not

10  present here.

11          MR. ROBOTTI:  And I understand that, Your Honor.

12  And we weren't trying to suggest that those are apples to

13  apples comparisons.

14          I think what we were trying to suggest is that in

15  those cases there certainly were a lot of mitigating factors

16  that aren't present here, no dispute, but there are also cases

17  out there, including those where the conduct, we thought, was

18  more significant, more severe than Joseph's conduct in terms

19  of, for instance, you know, burning police vehicles or in the

20  midst of a protest where there are people around, setting fire

21  to vehicles.  Or there's one case we cited where the defendant

22  who got twenty months actively tried to lock police officers

23  in a burning police building.  Right?  And ended up getting

24  twenty months, which is, you know, fifty months less than the

25  bottom of Joseph's guidelines.

1          We were simply trying to point out that those cases

2     had additional aggravating factors beyond what is here.  And

3     with respect to Joseph --

4          THE COURT:  But we all have to also recognize here

5     this is "there but for the grace of God," right?

6          MR. ROBOTTI:  Of course.

7          THE COURT:  I mean, because if I accept that this

8     was a heroin-fueled endeavor by him, certainly he was not

9     methodical in assessing how much damage may occur as a result

10    of the Molotov cocktail.  He got lucky.  We all got lucky.

11    The community got lucky.

12         MR. ROBOTTI:  I understand that point, Your Honor.

13         And I think but part of what we're supposed to

14    consider under 3553(a) are similar cases, right?  So we looked

15    out into the universe over the last couple of years and said

16    what type of sentences have people been getting?  There's no

17    perfect case.  There's no perfect comparison here.

18         THE COURT:  Those are just too far removed from this

19    case to be helpful.  I am aware of them, but they are not

20    helpful.

21         MR. ROBOTTI:  I understand your point, Judge.

22         THE COURT:  All right.

23         MR. ROBOTTI:  Okay.  Thank you.

24         THE COURT:  First of all, did the Government want to

25    say anything else?

1          MR. SILVERBERG:  Unless Your Honor has any

2    particular questions, I don't have anything to add.

3          THE COURT:  No.

4          Did Mr. Elias want to address the Court?

5          THE DEFENDANT:  Yes.

6          THE COURT:  All right.  If you can allow him to

7    please stand at the podium.

8          THE DEFENDANT:  Hi.

9          Excuse me, I'm just a little nervous.  I don't speak

10   in front of people and things like that.

11         THE COURT:  That's all right.

12         THE DEFENDANT:  You hear me?  Hello?

13         THE COURT:  Take your time.

14         THE DEFENDANT:  I can't believe I'm about to say

15   this, but, Your Honor, for the first time in my life, you

16   know, I'm going to have to side with the Government.  I'm

17   siding with the Prosecution because, you know, yes, I've

18   endured a lot of hardship in my life, in jail and at the time

19   when I was going through what I was going through, but, you

20   know, Your Honor, what I did was wrong.  What I did was very

21   wrong.

22         And it's not like I was in a blackout moment or

23   anything like that, so me just going over there and knowing

24   that I did what I did, throwing four -- not one, but four --

25   and walking away, I had no right to do that.

43

1          So I'm siding with the Government because, you know,

2   when I was locked up, I had a -- you know, during this

3   confinement, like when we was going through our confinement

4   issues, there was an inmate, a fellow inmate that I took a

5   real liking to.  He was an older man.  He was very smart.  He

6   wasn't into gang-banging.  And he became my roommate.  He goes

7   by the name of Mongoose.  And every time we would get locked

8   in our cell 108 plus hours a week, Mongoose would do nothing

9   but read four, five books a day.

10         And, you know, I'm the type of individual that I

11  have a disability with reading.  I can read.  I have a GED.  I

12  have a trade.  I know how to read.  It's not that I can't

13  read.  It's just that reading does two things to me.  It

14  mentally drains me so much that, like, I can have a full

15  twelve-hour day of sleep and just read two sentences and be so

16  tired and go right back to sleep for four, five hours.  So

17  reading was my worst subject in school.  Right?  And also, I

18  have a problem comprehending.  Like, I will have to read

19  something over and over and over and over and over and over

20  again just to get it.

21         So Mongoose used to read four, five books a day.

22  And I used to say:  Mongoose, you understand what you reading?

23  How do you read four, five books a day?

24         Mongoose put his book down.  And he also took a

25  liking to me.  He said:  Listen, I'm gonna tell you this

44

1   because I feel like I'm not wasting my time telling you this,

2   so I'm going to say it to you.  There are three things in life

3   that you do that will tell you who you are.  One is the books

4   you read, two is the media you take in, and three is the

5   people you surround yourself with.

6          So when Mongoose said that to me, that hit home

7   really, really hard.  Because I realized that my whole life, I

8   don't read books.  I never picked up a book any time.

9          So I also realized that a lot of the media I took in

10  was always negative.  Like, I believed in negative

11  stereotypes, negative things about cops, negative things about

12  the Government and the police and this.  Like, I was always

13  antipolice.

14         And then I realized that the people -- I didn't even

15  have one friend visit me or write me a letter.  You see who is

16  in the court right now, my mother.

17         So I realized that my life, I didn't even know

18  myself.  Right?  At that point.  I didn't know who I was.

19         And I thank God for the Federal Government because

20  even though I was going through what I was going through, when

21  my lawyer handed me my discovery, the first book I read in the

22  BOP was my rap sheet.  And I'm going to say "book" because my

23  rap sheet is about this thick and it's 42 pages, front and

24  back.

25         And the unique thing about the rap sheet is that it

1   has the most recent charge of whatever you did, crime.  So you

2   have to read it -- if you want to read it from forward to

3   back, you have to go to the last page and read it from the

4   last page to the front.  Okay?

5           And when I go all the way back to the beginning of

6   my day of crimes, or when I started getting caught for crimes,

7   and I seen the first charge, 2002, like it was something about

8   attempted robbery that I pleaded down to a grand larceny.  But

9   I seen how accurate, how accurate the pages was and everything

10  in my life started flashing back to me.  And I started saying:

11  Wow, I remember I did that.  I can't believe I did that.  I

12  did that, I did that, I did that, I did that, I did that.

13  Going all the way to today.

14          So that's why I'm siding with the Government.

15  Because the first book I read was the story of my life and I

16  started to be able to figure out who I was, and I don't think

17  I would have been able to figure out who I was if it wasn't

18  for my confinement.

19          After that, I began to read a lot.  There was

20  another three books that I read that changed my life forever.

21          Two is by the same author, Mitch Albom.  One is

22  named *The Five People You Meet in Heaven.*  Another one is

23  *Tuesdays with Morrie*.

24          And another one is a book called *What Dreams May*

25  *Come*, by Richard Matheson.  I think a movie was done by Robin

1   Williams --

2          THE COURT:  Yes.

3          THE DEFENDANT:  -- who died and committed suicide in

4   real life.

5          THE COURT:  Those are great books that you have just

6   identified.

7          THE DEFENDANT:  Yeah.

8          Those three books changed my life forever.

9          Then, after those books, this became my favorite

10   book.  I don't go anywhere without this book.

11          So I realized that, you know, I had to change the

12   people around in my life.  I had to start reading and being

13   more positive and not being around the negative.  And, you

14   know, all the -- like the media, like I said, always that I

15   took in was always bad media.  I always became antipolice,

16   anti.

17          But when I seen how accurate my rap sheet was, I

18   realized that, you know, I was always victim-blaming or

19   blaming somebody else.  "Mom, they messing with me.  Oh, they

20   messing with me.  They messing with me."  I never looked at

21   me, Your Honor.  I never took the responsibility.  This is the

22   first time in my life that I'm taking that responsibility.

23          THE COURT:  Thank you.

24          THE DEFENDANT:  And I know that, you know, the cops

25   and everybody, everybody's just decent people trying to do

47

1    their job.  I understand that now.

2              So with that, we prepared a statement.  And before I

3    read the statement that me and my attorney prepared, I have

4    this other book.  It's a great book.  It's called --

5              THE COURT:  I have that book in my house and in my

6    chambers.  My mother gave it to me.

7              THE DEFENDANT:  I wanted to give one to my mom, but

8    I don't think I -- I need this book for me.  But I'm

9    definitely going to buy her one.

10             And this is a day-by-day book.  I wanted to read

11   today, April 5th, into the record.

12             THE COURT:  Please, yes.

13             THE DEFENDANT:  *"Let Me fill you with my Love, Joy,*

14   *and Peace.  These are Glory-gifts, flowing from my living*

15   *Presence.  Though you are an earthen vessel, I designed you to*

16   *be filled with heavenly contents.  Your weakness is not a*

17   *deterrent to being filled with My Spirit; on the contrary, it*

18   *provides an opportunity for My Power to shine forth more*

19   *brightly.*

20             *As you go through this day, trust me to provide the*

21   *strength you need moment by moment.  Don't waste energy*

22   *wondering whether you are adequate for today's journey.  My*

23   *Spirit within you is more than sufficient to handle whatever*

24   *this day may bring.  That is the basis for your confidence.*

25   *In quietness (spending time alone with Me) and confident trust*

1  *(relying on My sufficiency) is your strength."*

2          THE COURT:  Isn't it incredible how that book always

3  seem to get it right, what you need on that day?

4          THE DEFENDANT:  I feel so, so connected to it.

5          THE COURT:  Yes, me too.

6          THE DEFENDANT:  And, Your Honor, another thing I

7  want to say, I want to say before I'm ready for you to pass

8  sentence on me, is the Our Father prayer.

9          But before I even get there, I want to say that, you

10  know, I've always been an independent person.

11          This is hard for me to do.  Like, this is one of my

12  fears, talking in front of everybody right now.  Like, this is

13  a very, very hard moment for me right now.  So I'm sorry if

14  I'm taking too much time.  Just please, everybody, bear with

15  me.

16          I've always thought I can do everything on my own

17  and that I never needed others.  I always tried to be

18  independent that way.  And, you know, I realized that I need

19  people in my life and I need help.

20          My attorney doesn't think that I need any more jail

21  time.  He thinks that I need treatment.  My mother thinks that

22  I need treatment, I don't need any more jail time.  But

23  they're from the outside looking in; I'm from the inside

24  looking out.  I just think that I need to bow out and ask for

25  help.  My pride has kept me in prison from that, from being

49

1    able to ask for help.

2           So no matter what you may sentence me today to --

3    time served, program, or more jail time -- the only thing I am

4    asking is that you please help me.  Please.

5           And with that, I will read the Our Father.  I will

6    say the Our Father prayer, because I know it by heart, and

7    I'll be ready for you to pass judgment on me.

8           THE COURT:  All right.

9           THE DEFENDANT:

10          Our Father who art in heaven, Hallowed be Thy Name.

11   Thy Kingdom come.  Thy will be done, on earth as it is in

12   Heaven.

13          Give us this day our daily bread.  And please

14   forgive us for our sins, as we forgive those who sinned

15   against us.  Please forgive us for our trespasses, as we

16   forgive those who trespassed against us.  And please forgive

17   us for our indebtedness as we forgive those who are indebted

18   to us.  We forgive them.

19          Please lead us away from temptation and deliver us

20   from evil.  For yours is the power, the glory, the honor and

21   the strength, forever and ever and ever and ever.

22          In the name of Jesus, hallelujah, Lord.

23          I pray today and I ask that you keep all these

24   people in this room with me safe, their friends, their

25   colleagues.  Keep the Judge safe, her family safe, everyone in

1  her circle safe.  Keep the District Attorney safe, everyone,

2  all his friends and colleagues and anyone in their circle

3  safe.  Keep the Department of Probation, my attorneys, my mom,

4  keep all of them safe, all those who I don't have a chance to

5  mention.

6            Those that are without food, please give them a way

7  to eat.

8            Those who are cold, please keep them warm.

9            And please, I pray that no matter what, God forgive

10 me for my sins.

11           In the name of Jesus.  Hallelujah.  Amen.

12           THE COURT:  Amen.

13           All right.  Thank you, Mr. Elias.

14           I am going to take a brief recess at this time.

15           But before I do so, Mr. Elias, you said a couple of

16 times that you were very nervous and not accustomed to

17 speaking.  I will tell you that what you said was incredibly

18 well spoken.

19           THE DEFENDANT:  Thank you.

20           THE COURT:  And well received by this Court.

21           And so I heard what you had to say and I will take

22 it into consideration as I make my determination.

23           Folks, I need a brief recess.  I will be right back.

24           THE COURTROOM DEPUTY:  All rise.

25           (Recess taken.)

51

1              (In open court; all parties present.)

2              THE COURT:  You all can be seated.

3              All right, folks.  I want to thank the parties for

4    their arguments here today.

5              But I want to also especially, again, recognize

6    Mr. Elias for the very honest statement that you gave to the

7    Court.  What you offered to the Court in terms of your view of

8    yourself and your crimes, I have to say, is somewhat

9    extraordinary and it is not often that this Court hears

10   someone recognize in the way that you recognized and accepted

11   responsibility for your conduct.  And so, it was particularly

12   moving to this Court.  And as I told you, I heard you and I

13   will take what you had to say into consideration.

14             That said, it is but one of many factors that I must

15   take into consideration in fashioning a sentence that I

16   believe is sufficient but not greater than necessary to

17   comport with the aims of sentencing.  I need to look to who

18   you are as an individual, the crime that was committed here,

19   which I believe you recognize completely and fully the

20   seriousness of this particular crime.

21             Among many things that you said, I was particularly

22   impressed by the fact that you did not sort of attribute your

23   conduct exclusively to your difficulties with drug addiction

24   but took responsibility and ownership over that, over that

25   conduct.  That is not to say that your attorney's argument to

1   this Court that you have suffered from a disease of drug

2   addiction were incorrect.  And I think that when I look at

3   your criminal history here, which has resulted in a

4   particularly high criminal history score, that many of the

5   crimes that you committed that contributed to that score were

6   crimes that I think are easily tied to your drug addiction.

7   There are some crimes in here, a couple of others, a couple of

8   the crimes in here that you received criminal history category

9   points for that perhaps there's some connection, but it is a

10  less, I think, direct connection to your drug addiction.

11          And so while I intend to vary downwards, as I

12  believe the criminal history score here is overstated, it does

13  not wipe out the criminal history altogether.  But I do intend

14  to vary downward in recognition that, in its own way, the

15  criminal history score here is overstated.

16          I also indicated that I intend to take into account

17  the conditions of confinement that you have had to endure

18  since you have been in custody, and I intend to do so.

19          In looking at the various factors that I must in

20  fashioning a sentence, I also have to take into account

21  rehabilitation.  Now here, your rehabilitation, in my mind,

22  you have indicated to this Court, I think, a genuine

23  willingness and desire to rehabilitate your life.  I do,

24  however, believe that your ability to fully rehabilitate

25  yourself is going to be tied to treatment that you need to

1   receive, for drug treatment, and I think that that is almost

2   undeniable.  And there has been a question about where that

3   treatment should take place.  And I think that I did not hide

4   the fact that I believe that the Bureau of Prisons, not the

5   MDC, has programs that will allow you to obtain drug

6   treatment.

7          And specifically, I am contemplating the RDAP

8   program.  I do not know if you have heard of that, sir.  Have

9   you?

10          All right.  It is a drug treatment program that is

11   provided by the Bureau of Prisons.

12          And so I am fashioning a sentence here today that I

13   believe takes into account all of the various factors set out

14   in 3553(a), including the rehabilitation, your history and

15   characteristics, the need to avoid unwarranted sentence

16   disparities.

17          And there is certainly a punishment component,

18   right?  As you know that there is.  You have been honest with

19   this Court and, therefore, undoubtedly honest with yourself

20   that there will be a punishment component to this.

21          And so I will tell you that looking at the criminal

22   history category and varying downward moves me -- if I had to

23   assign it by number in the criminal history categories, I will

24   tell you that moves me down, my assessment, closer to a

25   Criminal History Category IV.  So that is really where I think

1   is the starting point here, which is a 57- to 71-month

2   Guidelines range.  I believe that is the appropriate starting

3   point.  The Guidelines calculation that I calculated is the

4   correct calculation, but in recognition of what I believe is

5   an overstated criminal history category, my starting point is

6   at Criminal History Category IV, which is 57 to 71 months.

7          In addition, as I indicated, I will take into

8   consideration the conditions of confinement that Mr. Elias has

9   had to endure.  And in doing so, I hope to send a message to

10  Mr. Elias that I believe that those conditions were

11  intolerable and a message to the Government that it better fix

12  them.  If they believe that in this particular case a sentence

13  higher than that which I impose is appropriate, then the

14  Government needs to do its job so that the Court is enabled to

15  do its job unfettered by the conditions of confinement as a

16  consideration.

17         And again, I want to have a sentence here that will

18  allow Mr. Elias to participate in a drug treatment program

19  which has its minimum time periods attached to it.

20         So with that, the Court intends to sentence

21  Mr. Elias to 42 months in custody.

22         You have already served, sir, 20 months in custody,

23  which means by a straight count that leaves you 22 months in

24  custody.  And of course that does not take into consideration

25  the time that you may accrue as good time served.

1          THE DEFENDANT:  Thank you.

2          THE COURT:  I believe that sentence, sir, is

3    sufficient but not greater than necessary to comport with the

4    aims of sentencing.

5          And I hope that you can see that it also reflects

6    that the Court sees great potential in you and your ability to

7    turn your life around.

8          THE DEFENDANT:  Thank you.

9          THE COURT:  All right.

10          All right.  Now, I need to also determine whether to

11    and for how long to impose any term of supervised release.

12          In deciding a term of supervised release, the Court

13    is required by statute to consider the factors set forth in

14    18 U.S.C. Section 3583(c).  Those factors, in many ways,

15    mirror the factors set out in 3553(a) and they include the

16    nature and the circumstances of the offense; the history and

17    characteristics of the defendant; the need to afford adequate

18    deterrence to criminal conduct; the need to protect the public

19    from further crimes of the defendant; the need to provide the

20    defendant with needed educational or vocational training,

21    medical care or other correctional treatment in the most

22    effective manner; the need to avoid unwarranted sentence

23    disparities among defendants with similar records who have

24    been found guilty of similar conduct; the need to provide

25    restitution to victims; the kinds of sentences available and

1   any other pertinent policy statements.

2         Now, the Probation Department has recommended a

3   two-year period of supervised release.

4         Does the Government wish to make any argument with

5   respect to a supervised release period?

6         MR. SILVERBERG:  We defer to Probation in its

7   recommendation.

8         THE COURT:  All right.

9         Can I hear from the Defense.  Do you have a position

10  with respect to supervised release?

11        MR. ROBOTTI:  Your Honor, we agree that two years is

12  sufficient.

13        THE COURT:  Yes.  I do as well.

14        So, Mr. Elias, I am going to sentence you to a

15  period of two years of supervised release.

16        I must alert you that if you violate any of the

17  conditions of your supervised release, I may sentence you up

18  to two years in prison without credit for your prerelease

19  imprisonment or time previously served on post-release

20  supervision.

21        In addition, I must let you know that during your

22  period of supervised release, you must abide by the following

23  mandatory conditions of supervised release, and they are that

24  you must not commit another federal, state or local crime;

25        You must not unlawfully possess a controlled

1  substance;

2          You must refrain from any unlawful use of a

3  controlled substance;

4          You must submit to one drug test within 15 days of

5  release from imprisonment and at least two periodic drug tests

6  thereafter as determined by the Court;

7          You must cooperate in the collection of DNA as

8  directed by the Probation Officer.

9          Sir, you shall also abide by the following standard

10 conditions of supervised release.

11         They are that you must report to the federal

12 probation office in the federal judicial district where you

13 are authorized to reside within 72 hours of release from

14 imprisonment unless the probation officer instructs you to

15 report to a different probation office or within a different

16 time frame;

17         After initially reporting to the Probation Office,

18 you will receive instructions from the Court or the probation

19 officer about how and when to report and you shall report as

20 instructed;

21         You shall not knowingly leave the federal judicial

22 district where you are authorized to reside without first

23 getting permission from the Court or the probation officer;

24         You shall answer truthfully the questions asked of

25 you by the probation officer;

1          You shall live at a place approved by the probation

2    officer;

3          And if your plans change with respect to where you

4    live or anything about your living arrangements, including the

5    people you live with, you shall notify the probation officer

6    at least ten days before the change;

7          If notifying the probation officer at least ten days

8    in advance is not possible due to unanticipated circumstances,

9    you shall notify the probation officer within 72 hours of

10   becoming aware of the change or expected change;

11         You shall allow the probation officer to visit you

12   at any time at your home or elsewhere and you shall permit the

13   probation officer to take any items prohibited by the

14   conditions of your supervision that the probation officer

15   observes in plain view;

16         You shall work full time.  That is at least 30 hours

17   per week at a lawful type of employment;

18         If you do not have full-time employment, you shall

19   try and find full-time employment unless the probation officer

20   excuses you from doing so;

21         If your plans change with respect to where you work

22   or anything about your work, including your position or job

23   responsibilities, you shall notify the probation officer at

24   least ten days before the change;

25         If notifying the probation officer in advance is not

1  possible due to unanticipated circumstances, you shall notify

2  the probation officer within 72 hours of becoming aware of the

3  change or expected change;

4        You shall not communicate or interact with someone

5  you know is engaged in criminal activity;

6        If you know someone has been convicted of a felony,

7  you shall not knowingly communicate or interact with that

8  person without first getting permission of the probation

9  officer;

10        If you are arrested or questioned by a law

11  enforcement officer, you shall notify the probation officer

12  within 72 hours;

13        You shall not own, possess or have access to a

14  firearm, ammunition, destructive device, or dangerous weapon.

15  That is anything that was designed or was modified or the

16  specific purpose of causing bodily injury or death to another

17  person, like a Taser;

18        You shall not act or make any agreement with a law

19  enforcement agency to act as a confidential human source or

20  informant without first getting permission of the Court;

21        The probation officer determines based on your

22  criminal record, your personal history and characteristics, as

23  well as the nature and circumstances of your offense;

24        The probation officer, with prior approval of the

25  Court, may require you to notify the person about the risk and

1    you must comply with that instruction.

2          The probation officer may contact the person and

3    confirm that you have notified the person of the risk;

4          You shall follow the instructions of the probation

5    officer related to the conditions of your supervision.

6          All right.  The Court circulated to the parties a

7    list of four special conditions that the Court was seeking to

8    impose.  However, what I did realize is while there is a

9    mental health treatment component that is laid out here, there

10   is no drug treatment that is laid out here.  And so what I

11   want to make clear is that the Probation Department, at its

12   discretion, may determine whether drug treatment is necessary

13   in this case as a result of an evaluation that shall be

14   conducted upon his release from custody.

15         Is there language that you, by any chance, have on

16   that?

17         U.S.P.O. AUDAIN:  It's similar to the --

18         THE COURT:  Right, it just says "drug treatment."

19         U.S.P.O. AUDAIN:  Yes.  "Drug treatment evaluation."

20         THE COURT:  All right.

21         So to be clear, Mr. Elias will participate in a drug

22   treatment evaluation within -- give me the time frame.

23         U.S.P.O. AUDAIN:  Thirty days.

24         THE COURT:  Within 30 days of release from custody.

25         And the Probation Department, at its discretion,

 1 will have the ability to order that Mr. Elias participate in a

 2 drug treatment program.

 3          All right.  So, did you have an opportunity to read

 4 the other four special conditions?

 5          MR. ROBOTTI:  We did, Your Honor.  We went over that

 6 with Mr. Elias.

 7          THE COURT:  All right.

 8          Are the reasons for the Court's imposition of each

 9 of those conditions, including the drug treatment, apparent to

10 you on the face of the condition?

11          MR. ROBOTTI:  They are, Your Honor.  Thank you.

12          THE COURT:  All right.

13          And do you waive the reading of each of those

14 conditions for the purposes of this proceeding?

15          MR. ROBOTTI:  We do.  Thank you.

16          THE COURT:  All right.

17          Did you sign the document that was circulated?  Just

18 so that I can have a record of its disclosure to you.

19          I think somebody has it.

20          MR. ROBOTTI:  Yes.

21          THE COURT:  Okay.

22          (Pause in proceedings.)

23          THE COURT:  All right.

24          The special conditions of supervised release, which

25 has been executed by the parties as well as the Defendant, has

62

1  been marked as Court Exhibit No. 1 and the parties have agreed

2  to waiving the reading of the special conditions for the

3  record.

4       All right.  With respect to restitution, we

5  discussed that earlier.  Again, we have a restitution hearing

6  set for June 12th at 2:30 p.m. to the extent that the parties

7  are unable to come in agreement on a restitution amount, but I

8  am hopeful that you will.

9       I have to order that Mr. Elias pay a mandatory

10  special assessment in the amount of $100.

11       I do, however, decline to impose a fine, as it

12  appears Mr. Elias is unable to pay one.

13       Now, Mr. Elias, I want to apprise you of your rights

14  with respect to an appeal.

15       Sir, you have a statutory right to appeal your

16  sentence under certain circumstances, particularly if you

17  believe that your sentence is contrary to law.  However, I

18  must remind you that pursuant to paragraph 4 of your agreement

19  with the Government, you agreed not to appeal your conviction

20  or sentence if the Court imposed a sentence of imprisonment of

21  105 months or below, which I did today.

22       Any notice of appeal must be filed within 14 days of

23  the entry of a judgment or within 14 days of a filing of a

24  notice of appeal by the Government.

25       If requested, the Clerk will prepare and file a

1    notice of appeal on your behalf.

2           If you cannot afford to pay the cost of an appeal or

3    for appellate counsel, you have the right to apply for leave

4    to appeal in forma pauperis, which means you can apply to have

5    the Court waive the filing fee.  And on appeal, you may also

6    apply for court-appointed counsel.

7           Now, it is my intention, unless there is an

8    objection by the Defense, to recommend Mr. Elias be housed at

9    the Fort Dix facility and referred to the RDAP program.

10          MR. ROBOTTI:  There is no objection, Your Honor.

11          THE COURT:  All right.  That recommendation will be

12   made.

13          Mr. Elias, I want to say this to you and to your

14   mom.

15          I understand that -- especially to your mom -- that

16   you were hoping that the Court will release him today and I am

17   sorry that the outcome is it not what you had hoped, but he

18   will be home soon.  And when he gets home, the hard work that

19   you all have to do will begin.  If he is going to be

20   successful, he is going to need your help.  He has asked this

21   Court for help, and I promise you I will do all that I can to

22   help him, but I suspect he is going to need your help as well.

23          Fair enough?

24          MS. ESTRADA:  Yes.

25          THE COURT:  All right.

64

```
 1              Is Mr. Elias going to be residing in this district
 2    once he is released?
 3              Where is his home?  Is it in the Eastern District?
 4              U.S.P.O. AUDAIN:  It is.
 5              THE COURT:  All right.
 6              So, Mr. Elias, because you are going to likely
 7    reside in the Eastern District of New York, that means that I
 8    will be supervising you.
 9              So this will be the beginning of our journey
10    together, yes?
11              THE DEFENDANT:  Yes.
12              THE COURT:  And I expect great things from you, sir.
13              THE DEFENDANT:  Yes.
14              THE COURT:  All right.
15              Are there any other matters that I need to resolve?
16              MR. SILVERBERG:  Nothing from the Government,
17    although I believe there may be an application from the
18    Defense.
19    ███████████████████████████
20    ████████████████████████████████████████
21    ██████████
22    ████████████
23    ████████████████████████
24    █████████████████████████████████████████
25    ███████
```

65



9      MR. ROBOTTI:  And is there a motion to dismiss the

10  open counts from the Government?

11      THE COURT:  Are there open counts?

12      MR. SILVERBERG:  Yes.  We dismiss the indictment.

13      THE COURT:  The underlying indictment --

14      MR. SILVERBERG:  The underlying indictment.

15      THE COURT:  -- before the information?

16      MR. SILVERBERG:  Yes.

17      THE COURT:  All right.  The Government's motion to

18  dismiss the underlying indictment is granted.

19      Is there anything else?

20      MR. ROBOTTI:  Nothing from the Defense, Your Honor.

21      MR. SILVERBERG:  Nothing from the Government.

22  Thank you, Your Honor.

23      THE COURT:  Thank you.

24      All right.  Good luck to you, Mr. Elias.

25      THE DEFENDANT:  Thank you, Judge.

66

1          THE COURT:  Thank you.

2          Good luck to you, ma'am.

3          (Matter concluded.)

4

5                    *     *     *     *     *

6

7   I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

8

9   /s/ Andronikh M. Barna          April 10, 2024

10  _____   _____
        ANDRONIKH M. BARNA              DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25